Iris RICHARD, et al., Plaintiffs,

v.

**BELL ATLANTIC CORPORATION, INC., et al., Defendants.**

Civil Action No. 96–02168(RMU).

United States District Court, District of Columbia.

Sept. 10, 1997.

John Wadie Hermina, Hermina & Hermina, Laurel, MD, for Iris Richard, Jonathan Barnes, Kareem Abdul–Ali, Rosalyn Baylor, Joseph Bishop, Edward Brooks, Alvera Bullock, Eric Burden, Wilbert Burgess, Michael Camp, James Carrington, Reginald Clark, Diann R. Cooper, Joseph Cooper, Desta Daggert, Raymond Flowers, Clemantis Fortson, Michael Gillis, Faye Green, Kelvin Gunn, Syed Hasan, Brian Holloway, Marc Houston, Patrick Hunt, Elvin Jackson, Christopher Joseph, Kevin Logan, Vient Aries McKoy, Venida Medlock, Mary Ellen Monk, Clark Philogene, Everse Pullen, Gregory Rosser, Tangy Shields, Leighton Shrouder, William Stellmacher, Thomas Tolson, Lisa Vaughn, Michael Alan Walker, Denise Walton, William Washington, Brent Whitaker, Myra Williams, Ray Williams, Stanley Williams, Gwendolyn Woodar, Erik Wright, Terence Wynn.

Vincent Hamilton Cohen, Paul Charles Skelly, William Patrick Flanagan, Harry Thomas Jones, Jr., Hogan & Hartson, L.L.P., Washington, DC, for Bell Atlantic Corp., Raymond W. Smith, Bruce S. Gordon, Stuart C. Johnson, Edward Sproat, Danny R. Kiser, Anthony T. Murray, Roberta Lynch.

Vincent Hamilton Cohen, Hogan & Hartson, L.L.P., Washington, DC, for Kevin Pennington, Charles W. Crist.

### MEMORANDUM OPINION AND ORDER

URBINA, District Judge.

**Denying Defendant Bell Atlantic Corporation's Motion for Summary Judgment; Granting Individual Defendant's Motion to Dismiss; Granting Defendant Bell Atlantic–Delaware's Motion to Dismiss; Denying Defendant Bell Atlantic Corporation's Motion to Strike Plaintiffs' Class Allegations**

On April 4, 1997, the above-captioned case was re-assigned from the late Honorable Charles R. Richey to the undersigned member of the Court. This matter comes before the Court on four pending motions in this putative, race discrimination class action against Bell Atlantic Corporation ("BAC"), its subsidiaries, and several individuals: (1) defendant Bell Atlantic Corporation's motion for summary judgment; (2) defendants Raymond Smith, Charles Crist, and Kevin Pen-

nington's ("the individual defendants'") motion to dismiss; (3) defendant Bell–Atlantic–Delaware's motion to dismiss; and (4) the defendants' motion to strike the plaintiffs' class allegations. Upon consideration of the parties' submissions, the relevant law, and the entire record therein, the Court denies Bell Atlantic Corporation's motion for summary judgment; grants the individual defendants' motion to dismiss; grants Bell–Atlantic–Delaware's motion to dismiss; and denies the defendants' motion to strike the plaintiffs' class allegations.

## I. BACKGROUND

Forty-eight purported current and former employees of BAC filed a four-count class action complaint against BAC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq., as amended, and 42 U.S.C. § 1981. Specifically, plaintiffs' Count I and II allege employment discrimination on account of race and retaliation under Title VII. Plaintiffs' Count III alleges employment discrimination under § 1981. Finally, Count IV alleges a common law claim of intentional infliction of emotional distress.[1]

## II. DISCUSSION

### A. Summary Judgment Standard

The court may enter summary judgment if the moving party demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56(c) provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment: the requirement is that there is no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the non-moving party. Id. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

In summary judgment, the moving party has the burden of pointing out to the district court that the pleading, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate the nonexistence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party made a properly supported motion, the non-moving party must do more than merely show there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S.Ct. at 1356–57, 89 L.Ed.2d 538 (1986).

The adverse party must go beyond the pleading. Drawing from affidavits, depositions, and answers to interrogatories the nonmovant must designate specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553–54. Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to the party's case, and on which the party has the burden of proof. Id. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the adverse party's position is not sufficient to defeat summary judgment. Anderson, 477 U.S. at 252, 106 S.Ct. at 2512. The nonmovant party must point to the court evidence that allows a reasonable jury to find in its favor. Id. A court must view the facts in the light most favorable to the non-moving party and allow it the benefit of all reasonable inferences to be derived from the evidence in record. Anderson, 477 U.S. at 249, 106 S.Ct. at 2510–11.

### B. Bell Atlantic Corporation's Motion for Summary Judgment

On October 11, 1996, defendant Bell Atlantic Corporation ("BAC") moved to dismiss the plaintiffs' claims under Title VII and 42 U.S.C. § 1981 on the ground that it has not

---

1. For a more complete exposition of the facts surrounding this case, see Richard v. Bell Atlan- tic Corp., 946 F.Supp. 54 (D.D.C.1996).

employed and does not employ any of the named plaintiffs in this action. On November 25, 1996. Judge Richey denied BAC's motion without prejudice to BAC's right to renew said motion. *Richard v. Bell Atlantic Corp.*, 946 F.Supp. 54 (D.D.C.1996) ("November 25 Memorandum Opinion"). The Court afforded BAC the right to renew its motion (under either Rule 12, Rule 56, or both), after a sixty day period during which the plaintiffs would have the opportunity to conduct discovery on BAC's status as an "employer" under Title VII and § 1981. *Id.*

The limited discovery period has ended, the plaintiffs have filed an amended complaint, and BAC (and the other defendants) have filed an answer. BAC has renewed its motion in the form of a summary judgment motion, again arguing that it is not, and has never been, an "employer" of the plaintiffs pursuant to Title VII and § 1981. As in its original motion, BAC argues that all of the plaintiffs are or were employed by its subsidiaries, not by BAC, and therefore BAC should be dismissed from this lawsuit.

█ In his November 25 Memorandum Opinion, Judge Richey adopted the "integrated enterprise" test in order to determine whether there is a genuine issue regarding BAC's status as an employer of the plaintiffs. *See Richard v. Bell Atlantic Corp.*, 946 F.Supp. 54, 62 (D.D.C.1996).[2] A court must consider four factors when applying the "integrated enterprise" test, including (1) interrelation of operations, (2) centralized control of labor relations, (3) common man-

agement, and (4) common ownership or financial control. *Id.* at 61.

Judge Richey further ruled that evidence tending to show "centralized control of labor relations" should be the focus of the Court's analysis. *Id.* at 62. Therefore, the central question on summary judgment is whether there is a genuine issue that the parent controls the day-to-day employment decisions of the subsidiaries that employ or employed the plaintiffs. *Id.*

█ The evidence submitted by the plaintiffs in opposition to BAC's summary judgment motion is for the most part, disorganized, confusing and unauthenticated. As discussed below, plaintiffs have not submitted significantly probative evidence showing that the operations of BAC and its subsidiaries are interrelated. However, they have pointed to several facts suggesting that BAC has directly impacted material aspects of the plaintiffs' employment with their respective subsidiaries, such as in the areas of performance evaluations, promotions, and transfers.[3] There also is evidence of common ownership and common management in the human resources area. Because the plaintiffs appear to have raised a genuine issue as to three out of the four factors of the integrated enterprise test, particularly with regard to the most important factor (centralized control of labor relations), BAC's summary judgment motion must be denied.

### 1. Interrelation of Operations

The plaintiffs failed to submit evidence demonstrating that BAC's operations are in-

---

**2.** In a recent decision, the D.C. Circuit appeared to endorse the integrated enterprise test for claims brought under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101–12213. *See Equal Employment Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d. 621, 624–26 (D.C.Cir.1997).

**3.** BAC is the parent corporation to several subsidiaries. BAC's subsidiary **"Operating Companies"** include defendants Bell Atlantic–Washington, D.C., Bell Atlantic–Pennsylvania, Inc., Bell Atlantic–Delaware, Inc., Bell Atlantic–Maryland, Inc., Bell Atlantic–New Jersey, Inc., Bell Atlantic–Virginia, Inc. and Bell Atlantic–West Virginia, Inc. *Declaration of Kevin Pennington* at ¶ 2. The Operating Companies provide telephone service to states in the Mid–Atlantic region. *Id.*

BAC is also the parent corporation of Bell Atlantic Network Services, Inc. (**"NSI"**) and Bell Atlantic Communications and Construction Services, Inc. (**"BACCSI"**). *Id.* at ¶ 3. NSI provides the Operating Companies with technical assistance and other operational support. *Id.* The Operating Companies and NSI collectively are known as the **"Network Services Group."** *Id.* Beginning in 1994, the Network Services Group was reorganized from a geographic model, under which each Operating Company conducted its own operations, to a functional model under which various **"Lines of Business"** (**"LOBs"**) provide particular services across geographic boundaries. *Id.* at ¶ 6.

terrelated with those of its subsidiaries. While there is ample evidence in the record indicating that the subsidiaries' operations are interrelated (and that BAC made them interrelated), such evidence is "irrelevant to the interrelation of operations inquiry." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir.1993). This factor weighs in BAC's favor.

### 2. Centralized Control of Labor Relations

The centralized control of labor relations factor is the most important one in the integrated enterprise test. Based on the evidence in the record, the court concludes that this factor weighs in the plaintiffs' favor for four reasons: (1) BAC directly participates in the evaluation of its subsidiary employee's performance; (2) BAC drafted and implemented a comprehensive employment policy used by its subsidiaries; (3) BAC development and implement alleged discriminatory testing procedures used by its subsidiaries; and (4) BAC has influence and/or control over the transfer or promotion opportunities of its subsidiaries' employees.

### a. BAC's Direct Participation in the Evaluation of its Subsidiary Employees' Performance

There remains a genuine issue as to whether BAC is directly involved in the evaluation of its subsidiaries' employees' performance. While BAC argues that "the undisputed record evidence shows that BAC has no involvement in preparing performance evaluations of subsidiaries' employees (other than for a few high-level managers, which the law permits),"[4] plaintiff Iris Richard has submitted a copy of a written performance evaluation she received in 1992. *See Exhibit 10 to Amended Complaint.* That performance evaluation is captioned, *"Bell Atlantic Corporation Internal Auditing Department,"* suggesting that BAC was directly involved in the evaluation of her work. *Id.* (emphasis added). BAC has made no attempt to contest the authenticity or significance of Exhibit 10.

Additionally, BAC concedes that its Human Resources Department has "consultative involvement" with respect to all decisions concerning the hiring, discipline, promotion, evaluation, work assignments, training, and discharge of non-union employees of the subsidiaries,[5] thereby undermining BAC's argument that it has "no involvement in preparing performance evaluations of subsidiaries' employees." The Court concludes that there is a genuine dispute over BAC's involvement in the evaluation of its subsidiaries' employees.

### b. BAC's Drafting and Implementation of Comprehensive, Mandatory Employment Policies Used by Its Subsidiaries.

BAC acknowledges that its Human Resources Department has drafted the "Bell Atlantic Associate Appraisal and Development Plan" ("The Plan") that is applicable to all "bargaining-unit employees" of BAC subsidiaries. *See Exhibit 16 to Amended Complaint;* BAC's *Reply to Material Facts* at 4, ¶ 5; *Pennington Dec.* at ¶ 16; *Answer* at ¶ 16. The Plan states that its objective "is to provide organizations throughout Bell Atlantic with a consistent means of evaluating associate performance relative to corporate and functional requirements." *Exh. 16.*

The Plan is comprehensive, spanning fifteen, single-spaced pages touching on virtually every criterion by which an employee can be evaluated. Supervisors are required to evaluate employees on their integrity and ethics compliance, equal employment opportunity/diversity, safety compliance, attendance, punctuality, job performance, and customer satisfaction. Through so-called "decision criteria," the Plan details the precise manner in which supervisors are to determine whether their employees are complying with each of these requirements. Supervisors appraise compliance by indicating on an evaluation form, with respect to each criterion, whether the associate "Exceeds Requirements," "Meets All Requirements," "Meets Some, But Not All Requirements," or "Does Not Meet Requirements."

---

4. *BAC's Response to Plaintiffs Statement of Material Facts* at 2, ¶ 2.

5. *Declaration of Kevin Pennington* at ¶ 9.

The Plan also requires that supervisors, preferably with the input of their subordinates, establish performance objectives that "contribute to the achievement of organizational unit goals and the broader goals of Bell Atlantic during the performance year." The supervisors "should clearly describe the standards against which the associate's performance will be measured" and should "ensure reasonable consistency in the performance objectives for associates holding the same job title . . ."

Most significantly, the Plan provides that "all organizations *must* comply" with its provisions, except with respect to (1) incorporation of job title or department-specific performance standards, (2) language in the evaluation of associate performance contributions, and (3) customization of the sample associate appraisal form attached to the Plan. *Exh. 16* (emphasis added). Thus, with few exceptions, BAC's subsidiaries are required to follow the comprehensive and specific performance evaluation criteria developed by BAC.

While it is true that a "parent's broad general policy statements regarding employment matters are not enough" to show centralized control of labor relations,[6] the Associate Appraisal and Development Plan purports to be far more than a "broad general policy statement." Rather, it is a comprehensive listing of regimented rules regarding the evaluation of employees that BAC's subsidiaries are required to follow. Under these circumstances, the Plan evidences an attempt by BAC to exercise day-to-day control over its subsidiaries' employment decisions. *See Baker v. Stuart Broadcasting Co.*, 560 F.2d 389, 392 (8th Cir.1977) (finding that the integrated enterprise test was satisfied where the parent corporation issued policy manuals that were regimented and were required to be followed); *cf. Wood v. Southern Bell Tel. & Tel. Co.*, 725 F.Supp. 1244, 1249 (N.D.Ga. 1989) (finding no integrated enterprise where the subsidiary had discretion as to whether it was required to follow the parent's practices and procedures).

6. *Frank,* 3 F.3d at 1363.

The "Employee Code of Business Conduct" further evidences BAC's attempt to exert day-to-day control over its subsidiaries' employment decisions, specifically, with regard to discipline and termination decisions. The Code addresses employee conduct "reflecting a lack of honesty or integrity," such as theft, alcohol and drug use, misuse of company vehicles, misusing customer records, dishonesty, activity that is "disruptive to the work environment," and the possession of firearms. *See Exh. 17 to Amended Complaint.* The Code warns that "violations of the law, company policies and instructions governing day-to-day job performance can lead to discipline up to and including discharge and/or prosecution." BAC admits that its officers "have general oversight responsibility for and approve the Employee Code of Business Conduct when it is issued." *Answer* at ¶ 24. BAC further admits that the Code "applies to all employees of Bell Atlantic Corporation and its subsidiaries." *Id.*

### c. BAC's Development and Implementation of Allegedly Discriminatory Testing Procedures Used by Its Subsidiaries

There is a genuine issue in dispute as to whether BAC developed and implemented testing procedures that the plaintiffs claim have had an adverse impact on African–Americans. This allegation further evidences BAC's attempt to influence the day-to-day employment decisions of its subsidiaries. The plaintiffs allege the following:

BAC developed a number of standard tests for employees. These tests are used in all of the subsidiaries . . . These tests have had an adverse affect of keeping African–American employees from advancing into supervisory and management positions.

*Amended Complaint* at ¶ 15.

One of these alleged discriminatory tests is the Uniform Test Battery ("UTB"). In its answer, BAC admits "that the Human Resources organization of Bell Atlantic Corporation . . . developed . . . the Uniform Test Battery, which appl[ies] to associates in the

Operating Companies ..." *Answer* at ¶ 15.[7] BAC denies, however, that the UTB was "implemented in the subsidiaries by Bell Atlantic Corporation." *Id.* BAC further argues that "[a]s with other general policies applicable throughout the Bell Atlantic family of companies, such policies are not probative on the critical question before the Court (*i.e.*, whether BAC is so involved in the day-to-day employment decisions affecting the subsidiaries' employees that the parent and the subsidiaries may be deemed to be integrated)." *BAC's Response to Material Facts* at 4, ¶ 7.

BAC's argument is wrong as a matter of law. Based on the fact that the UTB is, in fact, followed in all of the Operating Companies, a reasonable jury could infer that BAC requires its subsidiaries to use the UTB, and therefore, that BAC implemented the UTB through its subsidiaries. Even assuming that BAC did not explicitly require its subsidiaries to implement the UTB, its universal implementation by the Operating Companies could permit a reasonable fact-finder to infer that BAC strongly influenced its subsidiaries to implement it. Accordingly, BAC's involvement with the UTB tends to show that it is directly involved in an employment practice the plaintiffs claim is racially discriminatory.

Additionally, even if BAC technically lacked employer-employee relationships with employees of the subsidiaries, this fact would not immunize BAC from Title VII liability if (a) the UTB is found to be unlawfully discriminatory and (b) BAC was the moving force behind its implementation by the subsidiaries. Certainly if BAC were to test its own employees (whoever they may be) with the UTB, BAC would be subject to Title VII liability if the UTB had an unlawful adverse impact on Blacks.[8] So too if BAC subjects its subsidiaries' employees to the UTB should it be liable for any unlawful adverse

impact on Black employees of its subsidiaries. As the D.C. Circuit held almost twenty-five years ago:

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited ... [B]oth injunctive and back pay relief (in the sense of monetary damages for lost employment opportunities) may be available, in an appropriate case, against respondents who are neither actual nor potential direct employers of particular complainants, ... but who control access to such employment and who deny such access by reference to invidious criteria.

*Sibley Memorial Hosp. v. Wilson,* 488 F.2d 1338, 1341–42 (D.C.Cir.1973) (footnote omitted). Thus, even assuming *arguendo* that BAC is not an employer of its subsidiaries' employees under the integrated enterprise test, the plaintiffs, at the very least, could sue BAC for its role in developing and implementing what the plaintiffs claim to be a discriminatory testing procedure.

### d. BAC's Influence and/or Control over Transfer and Promotion Opportunities

There is a genuine issue in dispute that BAC has significant influence over performance evaluations and testing by its subsidiaries. Furthermore, there also is a genuine issue that BAC has significant influence over its subsidiaries' employees' ability to be promoted and to transfer between Bell Atlantic subsidiaries. BAC explains that its Human

---

7. In light of this admission, it is odd that BAC now argues that "the UTB was developed by the Human Resources Department of NSI in consultation with an outside vendor, *not by BAC.*" *BAC's Mem. in Support of Summary Judgment* at 6–7 (emphasis added).

8. BAC argues that "it is beyond dispute that the UTB is not used to determine which employees are hired or promoted into particular positions, but rather is used only to establish minimum eligibility requirements that incumbent or pro-

spective employees must meet or exceed in order to apply for non-managerial positions." *BAC's Mem. in Support of Summary Judgment* at 7. Even if true, this fact would not immunize BAC from Title VII liability if (a) the "minimum eligibility requirements" developed by BAC disparately impact Black employees and (b) these requirements either are not job-related and/or are not consistent with business necessity. *See* 42 U.S.C. § 2000e–2(k)(1)(A).

Resources Department "has developed general job posting procedures for lateral transfers and promotional opportunities ... known as the Regional Associate Mobility Plan ("RAMP") ..." *Pennington* at ¶ 15. BAC designed RAMP "to efficiently link incumbent associates with positions that are advertised through a computerized system called 'STAR*JOBS.'" *Id.* For a subsidiary employee to be eligible for the RAMP, he or she, among other things, must be "currently rated 'Exceeds Requirements' or 'Meets All Requirements' in job performance" and be "qualified on the Universal Test Battery (UTB) or [be] test exempt for the position." *Exh. 20 to Plaintiff's Opposition.*

As with the UTB, BAC claims that it developed the RAMP, but was not responsible for implementing it. *See Answer* at ¶ 15. However, because the plaintiffs' evidence suggests that the RAMP applies to all nine of the Network Services Group subsidiaries,[9] a reasonable jury could infer that BAC requires its subsidiaries to participate in the RAMP, and therefore, that BAC implemented the RAMP through its subsidiaries. Again, the Court has before it more evidence tending to show an effort by BAC to influence the day-to-day employment decisions of its subsidiaries. Based on this evidence and the other evidence discussed above, the Court concludes that the centralized control of labor relations factor weighs in the plaintiffs' favor.[10]

9. *See Exh. 18 to Plaintiff's Opposition.*

10. BAC points out that it does not have any union-represented employees and that the subsidiaries are free to choose to bargain together or separately, and to decide to have common or separate labor relations staff. *Declaration of P. Alan Bulliner* at ¶ 13. This fact, however, cannot overcome the clear suggestion that BAC has established mandatory employment policies in order to control the day-to-day employment decisions of its subsidiaries. Thus, while BAC may not have absolute control over its subsidiaries' labor relations practices (e.g., with respect to collective bargaining agreements), there is a genuine issue that it controls several significant employment practices which are central components the employer-employee relationship (e.g., performance reviews, employee conduct warranting termination, testing).

### 3. Common Management

As discussed in note 2, *supra,* BAC has coordinated the functional operations of its subsidiaries through the "Lines of Business" corporate structure that BAC implemented at the beginning of 1994. *Pennington Dec.* at ¶ 6; *Declaration of P. Alan Bulliner* at ¶¶ 11–12; *Answer* at ¶ 21. Recognizing that the Operating Companies could operate more efficiently and cost-effectively if they were organized functionally rather than strictly by geographic location, BAC reorganized the Operating Companies from a geographic model, under which each Operating Company was responsible for all business activities within the particular state in which it operated, to a functional model under which various "Lines of Business" ("LOB") provide particular services across geographic boundaries. *Bulliner Dec.* at ¶ 11.[11]

Mr. Kevin Pennington, who is both Vice President of Human Resources for BAC and the Vice President of Human Resources for Bell Atlantic Network Services, Inc.,[12] states that when BAC adopted the LOB model, "the Human Resources staff was reorganized so that each Line of Business within the Network Services Group has its own Human Resources Director and staff." *Pennington Dec.* at ¶ 6. Pennington further states, in part, "[T]he LOB Presidents and I generally share responsibility for hiring, promoting, and discharging LOB Human Resource Directors ..." *Pennington Dec.* at ¶ 7.[13] Thus,

11. Because there is no dispute that the Operating Companies are not separated from one another geographically, it is suspicious that BAC's counsel told Judge Richey at the initial status conference that the Operating Companies serve only particular geographic locations (e.g., Bell Atlantic–Maryland serves only Maryland and cannot do any business in the District of Columbia). *Compare Answer* at ¶ 15 ("[D]efendants admit that employees with positions in each of the Lines of Business work in the District of Columbia.").

12. *Answer* at ¶ 8. BAC claims that Pennington "is a corporate officer of Bell Atlantic Corporation but not of Bell Atlantic Network Services, Inc." *Id.*

13. In light of Pennington's declaration that he has significant control over the employment of the top human resources personnel of the Lines

there is evidence that BAC, through one of its corporate officers, controls the day-to-day employment of the Human Resources Directors for BAC's subsidiaries.

BAC also has admitted that Pennington "assisted in developing and had oversight responsibilities for certain broad, general human resources policies (including testing, performance evaluation, discipline, affirmative action and equal employment opportunity matters) affecting employees in Bell Atlantic Corporation and its subsidiaries ..." *Answer* at ¶ 23. Additionally, BAC has admitted that Pennington and Raymond Smith, the Chairman and Chief Executive of BAC, "had the authority, based on their positions, to recommend investigations of employment matters occurring in Bell Atlantic Corporation and its subsidiaries." *Id.* at ¶ 30. Finally, BAC has admitted that Pennington, and his predecessor, Charles W. Crist, "have (or had) participated in developing and have (or had) oversight responsibilities for equal employment opportunity policies, and that they have (or had) authority to recommend corrective action for violations of such policies." *Id.* at ¶ 32. Thus, BAC's own admissions suggest that its corporate officers have developed numerous employment policies (several or all of which are mandatory) and have the authority to (a) investigate employment matters involving its subsidiaries and (b) take corrective action if they determine that those employment policies have been violated. These are core functions of an employer.

BAC dismisses Pennington's significant influence over the human resources function of its subsidiaries by pointing to the general rule that "[o]ne common manager is insufficient to establish a disputed material fact under the [common management] prong of the integrated enterprise test." *Frank*, 3 F.3d at 1364. But unlike the one common

manager in *Frank* who was a marketing manager, here, the common manager—Pennington—controls, or at least significantly influences, the human resources functions of the subsidiaries. Thus, BAC and its subsidiaries have common management in an operational area (human resources) that is highly probative of whether BAC controls the day-to-day employment decisions of its subsidiaries. *See McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 933–34 (11th Cir. 1987) (integrated enterprise found where president of the parent controlled the personnel management of both companies, and the two companies had a common president and secretary).[14]

While BAC and its subsidiaries have few common officers and do not have interlocking Boards of Directors,[15] the area where there is overlap is too central to the allegations in this case to ignore. Therefore, the court concludes that common management factor must weigh in the plaintiffs' favor.

### 4. Common Ownership

BAC does not address the common ownership prong of the integrated enterprise test.

However, it is undisputed that BAC is a regional holding company and the parent corporation of the subsidiaries. *See Bulliner Dec.* at ¶ 2. Therefore, there is a genuine issue that BAC and its subsidiaries are commonly owned. This factor weighs in the plaintiffs' favor.

Accordingly, because there is a genuine issue as to three out of the four factors of the integrated enterprise test (including the most probative, centralized control of labor relations factor), BAC is not entitled to summary judgment on the issue of whether it is an "employer" for purposes of Title VII and § 1981. Further, even assuming *arguendo* that BAC is not an employer of its subsidiar-

---

of Business, the following assertion in BAC's reply brief is puzzling: "Even assuming as true plaintiffs' characterization that human resources personnel employed by [Bell Atlantic Network Services, Inc.] and advising the Group Presidents of the Lines of Business actually report to (and might be evaluated by) Mr. Pennington—a characterization which as Mr. Pennington's declaration makes clear is just not true ..." *BAC's Reply* at 6 n. 4. Pennington's declaration clearly suggests that the top human resources employee of

Network Services, Inc.—the Human Resources Director—reports to and is evaluated by Pennington.

14. BAC and the subsidiaries also have common Assistant Secretaries and Assistant Treasurers. *See Bulliner Dec.* at ¶ 7.

15. *See Bulliner Dec.* at ¶ 6.

ies' employees under the integrated enterprise test, the plaintiffs could sue BAC under Title VII and § 1981 for its role in developing and implementing what the plaintiffs have alleged to be a discriminatory testing procedure. Therefore, the Court denies BAC's motion for summary judgment.

## C. The Individual Defendants' Motion to Dismiss

On November 25, 1996, Judge Richey dismissed the individual defendants from this lawsuit, without prejudice, because the original complaint had failed to plead any specific facts showing that this Court has personal jurisdiction over them. *See Richard,* 946 F.Supp. at 70–74. Judge Richey gave the plaintiffs 60 days to conduct discovery in order to gather sufficient jurisdictional facts to demonstrate that the Court has personal jurisdiction over the individual defendants. *Id.*

■ With respect to the original complaint, the Court observed that the plaintiffs had pled no allegations regarding residences or principal places of business of any of the individual defendants sufficient to show general jurisdiction over them under § 13–422 of the D.C.Code. Like the original complaint, the amended complaint does not contain any such allegations. Therefore, the Court lacks general, personal jurisdiction over the individuals.

■ Nor have the plaintiffs alleged sufficient jurisdictional facts to bring the individual defendants within the Court's long-arm jurisdiction under § 13–423 of the D.C.Code. As the Court previously instructed the plaintiffs, "[p]ersonal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." *Richard,* 946 F.Supp. at 73–74 (*quoting Wiggins v. Equifax Inc.,* 853 F.Supp. 500, 503 (D.D.C.1994)). As with the original complaint, the plaintiffs have not alleged that the individual defendants did anything discriminatory outside of their official corporate capacities.

The alleged jurisdictional facts regarding Raymond Smith, Chairman and CEO of BAC, are as follows: (1) he was involved in drafting and approving the implementation of allegedly discriminatory workplace policies; (2) he was involved in several investigations of discrimination in BAC and its subsidiaries; (3) he is "responsible for setting Human relations policies and procedures for BAC and its subsidiaries and [is] able to make decisions concerning the hiring, firing, RIF's, investigations of claims of discrimination, training, and numerous other areas affecting Plaintiff's [sic] employment;" (4) he "intentionally, deliberately and with actual malice [took] actions and made decisions which adversely, directly and disparately impacted upon African–American employees within BAC's over 61,000 employee workforce," resulting in harm to employees in Washington, D.C. and elsewhere; (5) he participated in "Diversity Management Programs" in Washington, D.C.; (6) he visits and speaks to employees in Washington, D.C. on a regular basis; (7) he engineered the Lines of Business model; (8) he helped develop the Employee Code of Business Conduct and Equal Employment Opportunity/Affirmative Action document; and (9) he has been "involved in the day-to-day employment decision making processes" within the Bell Atlantic companies and directed investigations of employees within those companies.

The alleged jurisdictional facts regarding Charles Crist, former Vice President of Human Resources of BAC, are as follows: (1) he was "responsible for setting Human relations policies and procedures for BAC and its subsidiaries and [was] able to make decisions concerning the hiring, firing, RIF's, investigations of claims of discrimination, training, and numerous other areas affecting Plaintiff's [sic] employment;" (2) he "intentionally, deliberately and with actual malice [took] actions and made decisions which adversely, directly and disparately impacted upon African–American employees within BAC's over 61,000 employee workforce," resulting in harm to employees in Washington, D.C. and elsewhere; (3) he was in charge of selecting the type of testing to be administered throughout Bell Atlantic companies; (4) he has "condoned and approved racially-segre-

gative policies carried out by Bell Atlantic;" (5) he made remarks which shows his racial biases; and (6) he was "involved in the day-to-day employment decision making processes" within the Bell Atlantic companies and directed investigations of employees within those companies.

The alleged jurisdictional facts regarding Kevin Pennington, the current Vice President of Human Resources of BAC, are as follows: (1) he is "responsible for setting Human relations policies and procedures for BAC and its subsidiaries and [is] able to make decisions concerning the hiring, firing, RIF"s, investigations of claims of discrimination, training, and numerous other areas affecting Plaintiff's [sic] employment;" (2) he "intentionally, deliberately and with actual malice [took] actions and made decisions which adversely, directly and disparately impacted upon African–American employees within BAC's over 61,000 employee workforce," resulting in harm to employees in Washington, D.C. and elsewhere; (3) he participated in "Diversity Management Programs" in Washington, D.C.; (4) he was in charge of selecting the type of testing to be administered throughout Bell Atlantic companies; (5) he has "condoned and approved racially-segregative policies carried out by Bell Atlantic;" (6) he has made remarks which shows his racial biases; and (7) he has been "involved in the day-to-day employment decision making processes" within the Bell Atlantic companies and directed investigations of employees within those companies.

All of these alleged jurisdictional facts involve the individual defendants' official duties

for Bell Atlantic Corporation—setting policies, communicating with employees, conducting investigations, and making employment decisions.[16] As a matter of law, the defendants were at all times acting within the scope of their employment, because they were authorized to perform such acts for BAC. Accordingly, the plaintiffs have failed to plead sufficient jurisdictional facts, because acts committed within the scope of employment cannot be imputed to the individual defendants to establish personal jurisdiction over them. *See Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 1482 n. 13, 79 L.Ed.2d 790 (1984); *Wiggins*, 853 F.Supp. at 503 (finding no personal jurisdiction over two supervisors at a credit reporting company, because they acted within the scope of their employment when they purportedly (a) issued and transmitted the plaintiffs credit reports to another office and (b) supervised employees who collected information on the plaintiff).[17]

The plaintiffs' conclusory and factually-unsupported allegations that the individual defendants acted with a discriminatory intent does not alter the fact that all of the alleged unlawful employment actions were committed by the individual defendants within the scope of their employment. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) ("[A] supervisory employee who fires a subordinate is doing the kind of thing he is authorized to do, and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities . . .").[18] Accordingly, the court

---

**16.** The allegations about discriminatory remarks do not touch on the individual defendants' official duties for BAC. However, the plaintiffs fail to explain how these purported remarks (wherever they were uttered) confer personal jurisdiction over the individual defendants.

**17.** While it may be true that the individual defendants are not necessarily immune from liability under § 1981 for acts of intentional race discrimination committed within the scope of their employment with BAC, the instant question is not about individual liability, but about *jurisdiction*. Because jurisdiction over an individual cannot be premised solely upon actions committed within the scope of employment, the liability of the individuals, if any, cannot be addressed in this Court.

**18.** *See Causey v. Balog*, 929 F.Supp. 900, 906 (D.Md.1996) (holding that the "individual defendants acted within the scope of the duties delegated to them" when they allegedly carried out the city administration's systematic policy of discriminating against older white employees, a pattern that culminated in the plaintiff's firing); *Robins v. Max Mara, U.S.A., Inc.*, 914 F.Supp. 1006, 1010 (S.D.N.Y.1996) (holding that two corporate presidents acted within the scope of their employment where they allegedly "instigated or approved the discriminatory actions age bias of [other] defendants" and "approve[d] the interference with and violation of the commitments and agreements that [another] defendant had made to plaintiff"); *Vodde v. Indiana Michigan Power Co.*, 852 F.Supp. 676, 679 (N.D.Ind.1994) (noting that deliberate acts of an employee acting within

grants the individual defendants' motion to dismiss with prejudice for lack of personal jurisdiction.

### D. Bell Atlantic–Delaware's Motion to Dismiss

■ Neither the plaintiffs' complaint nor amended complaint alleges that a single plaintiff was employed or compensated by Bell Atlantic–Delaware, Inc ("BA–DE"). The plaintiffs have failed to allege that any one of them was discharged, disciplined or otherwise wrongfully treated in the terms and conditions of his or her employment with BA–DE. The defendants argue that plaintiffs claims *against* BA–DE should be dismissed for failure to state a claim upon which relief can be granted. The Court agrees.

The plaintiffs argue that a Mr. James E. Hall, an African–American systems technician with BA–DE, has suffered discrimination. The plaintiffs, however, appear to concede that none of the plaintiffs (Hall is not a named plaintiff) is or was employed by BA–DE. Thus, the plaintiffs have not alleged any harm by BA–DE. Accordingly, the Court concludes that BA–DE must be dismissed from this lawsuit.

### E. The Defendants' Motion to Strike Class Allegations

■ Rule 203(b) of the *Rules of the United States District Court for the District of Columbia* provides, in part, "Within 90 days after the filing of a complaint in a case sought to be maintained as a class action, unless the Court in the exercise of its discretion has extended this period, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case may be so maintained." Local Rule 203(b). The defendants point out that the plaintiffs filed the original complaint on September 23, 1996 and the amended complaint on January 27, 1997, both over 90 days ago. Defendants argue that since the plaintiffs have yet to file a motion for class certification, this Court should strike the class allegations under Local Rule 203(b).

At the initial status hearing held on September 27, 1996, plaintiffs' counsel "asked the Court to permit [the plaintiffs] to take approximately 100 depositions during the pre-class certification phase of discovery." *Richard v. Bell Atlantic Corp.*, Civ. Action No. 96–2168 (D.D.C. Sep. 30, 1996) (order staying discovery pending resolution of defendants' Rule 12 motion). Judge Richey rejected this proposal; however, Judge Richey permitted plaintiffs to conduct twenty depositions to be completed in a thirty day period (by October 28, 1996). *Id.*

At that same hearing, defendants' counsel informed Judge Richey that none of the plaintiffs were employees of Bell Atlantic Corporation, and therefore, he intended to file a dispositive motion. Defense counsel further "requested a stay of pre-class certification discovery until the Court's resolution of said Motion." *Id.*

Judge Richey granted the defendants' request and ordered, in part,

> that all discovery in the [case] shall be stayed pending the Court's determination of the above-referenced Motion [and] that if the Court denies the defendant's Rule 12 Motion, the discovery schedule shall be reset in a manner consistent with this Order. *Id.*

In other words, as a courtesy to the defendants, Judge Richey "froze the litigation in its tracks" for the time it would take the Court to rule on the defendants' dispositive motion. Judge Richey advised the defendants that the litigation would pick up where it had left off if the Court were to deny the defendants' motion. Moreover, Judge Richey clearly contemplated that the plaintiffs were entitled to at least 30 days of pre-class certification discovery *before* moving for class certification. Thus, it would have been extremely unfair and inefficient for Judge Richey to have denied the plaintiffs their right to pre-class certification discovery, but then to have required them to file a motion for class

---

the scope of his authority include "authority encompassing a supervisor rating an employee[ ] and a supervisor determining inter-departmental

transfers of employees") (citing *Shager*, 913 F.2d at 404).

certification without the benefit of any such discovery.[19]

If not by word, then by deed, Judge Richey extended the 90–day period under Local Rule 203 when he stayed all discovery on September 27, 1996. To the extent Local Rule 203(b) required an explicit ruling by Judge Richey, the Court hereby formally extends the 90–day period for the plaintiffs to file their motion for class certification until December 17, 1997. Therefore, the Court denies defendants' motion to strike class allegations.

## III. CONCLUSION

For the reasons stated above, it is this 10 day of September, 1997,

### SO ORDERED.

A separate Order for Entry of Judgment accompanies this Memorandum Opinion and Order.

### *ORDER*

**Denying Defendant Bell Atlantic Corporation's Motion for Summary Judgment; Granting Individual Defendant's Motion to Dismiss; Granting Defendant Bell Atlantic–Delaware's Motion to Dismiss; Denying Defendant Bell Atlantic Corporation's Motion to Strike Plaintiffs' Class Allegations**

This matter comes before the Court on four pending motions in this putative, race discrimination class action against Bell Atlantic Corporation ("BAC"), its subsidiaries, and several individuals: (1) defendant Bell Atlantic Corporation's motion for summary judgment; (2) defendants Raymond Smith, Charles Crist, and Kevin Pennington's ("the individual defendants'") motion to dismiss; (3) defendant Bell–Atlantic–Delaware's motion to dismiss; and (4) the defendants' motion to strike the plaintiffs' class allegations. Upon consideration of the parties' submissions, the relevant law, and the entire record therein, for the reasons set forth in the Memorandum Opinion and Order issued on the 10th day of September, 1997, the Court denies Bell Atlantic Corporation's motion for summary judgment; grants the individual defendants' motion to dismiss; grants Bell–Atlantic–Delaware's motion to dismiss; and denies the defendants' motion to strike the plaintiffs' class allegation.

Accordingly, it is this 10th day of September, 1997,

**ORDERED** that defendant Bell Atlantic Corporation's motion for summary judgment be and is hereby **DENIED;** it is

**FURTHER ORDERED** that a motion to dismiss filed by individual defendants Raymond Smith, Charles Crist, and Kevin Pennington be and is hereby **GRANTED;** it is

**ORDERED** that defendant Bell–Atlantic–Delaware's motion to dismiss be and is hereby **GRANTED;** it is

19. The defendants' suggestion that the plaintiffs should have filed their motion for class certification within 90 days and then requested that the Court stay a ruling on that motion until after pre-class certification discovery appears to countenance an extremely inefficient procedure. First, if the Court had granted the defendants' dispositive motion, the plaintiffs would have gone to the trouble of drafting a class certification motion for nothing. Second, even if the plaintiffs had filed the motion, there is little doubt that they would have amended their motion based upon later-discovered information obtained through 20 or more depositions. The defendants, in turn, would have sought to amend their oppositions to the motion. Such duplication of effort would have posed a substantial burden to the parties and to the Court and would have been inconsistent with the mandate of Fed.R.Civ.P. 1, which requires that the Federal Rules of Civil Procedure be "construed and administered to secure the just, speedy, and inexpensive determination of every action."

In any event, the defendants' reliance on Judge Harris' decision in *Weiss v. International Brotherhood of Elec. Workers*, 729 F.Supp. 144 (D.D.C.1990), is misplaced. There, the plaintiff argued that she should be relieved from the 90–day rule because she allegedly had not had "adequate time" for discovery. *Id.* at 148. Judge Harris held that "[e]ven if she needed to conduct *further* discovery, she could have moved for class certification and requested that the Court postpone its ruling." *Id.* (emphasis added). The *Weiss* case implies, therefore, that the plaintiff had the benefit of some discovery, just not full discovery. Here, in contrast, the plaintiffs did not have the benefit of *any* pre-class certification discovery whatsoever, thereby utterly stymieing their efforts to move for class certification.

**FURTHER ORDERED** that the defendants' motion to strike the plaintiffs' class allegations be and is hereby **DENIED;** it is

**ORDERED** that the plaintiffs shall have until December 17, 1997, to file their motion for class certification. The defendants shall file any oppositions thereto by January 19, 1998. The plaintiffs shall file any replies thereto by January 30, 1998; it is

**FURTHER ORDERED** that the Court's order issued on September 30, 1996, is modified in that the stay on pre-class certification discovery is hereby **LIFTED.** All pre-class certification discovery shall be completed by November 17, 1997, and the parties shall meet and confer regarding all discovery disputes. There shall be no stipulated extensions for discovery. The plaintiffs shall be limited to twenty depositions, and may depose additional witnesses only upon application to the Court and upon a showing of good cause; and it is

**ORDERED** that a Status Conference is scheduled on March 2, 1998 at 10:00 AM E.S.T.

**SO ORDERED.**