

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-2-2000

# Shaner v. Synthes (United States)

Precedential or Non-Precedential:

Docket 99-1037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Shaner v. Synthes (United States)" (2000). *2000 Decisions.* Paper 43.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/43

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 2, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1037

ROBERT D. SHANER, JR.,

     Appellant

v.

SYNTHES (USA)

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-04212)
District Judge: Honorable Louis C. Bechtle

Argued January 24, 2000

BEFORE: GREENBERG, ROTH and ROSENN,
Circuit Judges

(Filed: March 2, 2000)

     Alan B. Epstein (argued)
     Spector, Gadon & Rosen
     1635 Market Street
     Seven Penn Center, 7th Floor
     Philadelphia, PA 19103

     Attorneys for Appellant


     Anthony B. Haller (argued)
     Stephen J. Sundheim
     Pepper Hamilton LLP
     3000 Two Logan Square
     Eighteenth and Arch Streets
     Philadelphia, PA 19103-2799

     Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before this court on appeal from
the district court's order entered December 14, 1998,
granting summary judgment in favor of appellee Synthes

(USA) ("Synthes" or "the company") dismissing appellant's complaint asserting claims under the Americans with Disabilities Act, 42 U.S.C. S 12101 et seq. ("ADA"), and Pennsylvania common law. For the reasons we set forth herein, we will affirm the order of the district court.

## I. BACKGROUND

Synthes, which is in the business of manufacturing and distributing orthopedic and spinal implants and instrumentation, hired appellant Robert Shaner in September 1991 as a senior programmer/analyst in its information services department. In 1992, Synthes gave Shaner a six percent raise despite its practice of capping raises at five percent.

In July 1992, Dick Jarvis joined Synthes and became Shaner's superior. In August 1992, Shaner was diagnosed with multiple sclerosis ("MS"). It is undisputed that Shaner did not disclose his ailment to the company until more than a year later, on November 15, 1993.

In May 1993, Jarvis gave Shaner his first performance evaluation. The evaluation indicated that the "major problem" with Shaner was that he relied too heavily on quick "fix" solutions without locating underlying problems in the computer systems. It concluded that Shaner

2

"performs his duties as a Senior Programmer" but that he "has not demonstrated that he has the skills of a senior analyst."[1] Shaner felt this evaluation was overly critical and he was unhappy with it. Thus, Shaner filed a complaint with the company regarding this evaluation. Shaner suspected that Jarvis did not like him, and it appeared to Shaner that the reason for the criticism was Jarvis's desire to get rid of programmers, such as himself, who had been with Synthes before Jarvis joined the company.

On April 5, 1994, Jarvis gave Shaner another evaluation. This evaluation contained critical remarks similar to those in the prior evaluation.[2] It indicated that Shaner was not proficient in identifying underlying problems in the computer systems and it concluded that Shaner "has not demonstrated [the] skills of a Senior Analyst." It further indicated that Shaner "displays a negative attitude about his job and does not seem happy with the job he performs." Shaner felt that this evaluation was "almost a carbon copy" of the 1993 evaluation.

On April 13, 1994, Shaner filed a charge of disability discrimination with the Equal Employment Opportunity

Commission ("EEOC") alleging that Synthes had denied him computer training in the area of "PC Applications."3 He claimed the company had promised him this form of training when he first began his employment and that the training had been given to other programmer/analysts. In January 1994, Shaner had sent a pointed email to Jarvis asking "[i]s there any reason I'm being excluded from

_____

1. The evaluation rated Shaner's performance on a scale of 1 to 4, with 4 being "superior," 3 being "above average," 2 being "average," and 1 being "below average." Shaner received a 3 in the category of "assignments and results achieved," a 2.8 in"qualitative," and a 2.8 in "overall performance."

2. In this evaluation, Shaner was graded "meets expectation" in the category of "assignments and results achieved" and "marginal" in the categories of "qualitative" and "overall performance." A "marginal" grade indicated that Shaner "does not consistently meet objectives."

3. According to Shaner's brief, he first contacted the EEOC on March 30, 1994. There is nothing in the record to indicate that Synthes became aware of Shaner's contact with the EEOC until after Shaner filed his charge on April 13, 1994.

EXCEL TRAINING4 when other programmers in this department have taken the training, with YOUR approval [?]" Jarvis sent a responsive email stating"[w]e have not offered Excel training to the AS/400 group [Shaner's group] at this time. You do not need Excel to perform your job."

In the summer of 1994, Shaner went on a medical leave of absence for more than one month. Upon his return, the company lightened his work load during month-end closing procedures, which often required long hours on his part. Shaner welcomed this reduced work load. In addition, the company permitted him to miss work every Tuesday morning so he could attend an eleven a.m. water therapy class at a location which was over an hour's drive from the office.5 He continued to attend the water therapy class throughout his employment with Synthes. The company also permitted him to go home early when he was not feeling well.

One of Shaner's principal allegations is that various employees, along with Jarvis, frequently turned up the heat in the office despite Shaner's requests that the office be kept cool; the excessive warmth allegedly exacerbated Shaner's MS symptoms. Shaner indicated in his deposition that the heat had been a problem for him even before November 1993, when he advised the company that he

suffered from MS. In response to a complaint from Shaner, Mike DiGuglielmo, another of Shaner's superiors, emailed Shaner in May 1994 asking him to provide a doctor's note stating what working conditions were not good for his medical condition. Nevertheless, Shaner did not present the requested note from his doctor until November. The note was not specific as it merely indicated that the temperature in Shaner's work environment should be kept "on the low side."

Shaner requested that a "lock box" be placed on the thermostat to prevent employees from repeatedly adjusting the office temperature. Although lock boxes were present on thermostats elsewhere in the building, the company did not

_____

4. Excel training involved the operation of PC applications.

5. Shaner was required to make up the missed time on other days.

4

place one in Shaner's work area. However, in November 1994, the company relocated Shaner's office to a converted conference room which had its own thermostat so that he could control the temperature in his work space. 6 Shaner alleges that, on four or five occasions in 1995, an unknown individual or individuals covertly entered the conference room while Shaner was at lunch and turned the heat all the way up. On these occasions, Shaner returned from lunch and noticed that the room was overly warm, whereupon he adjusted the heat back down.

In late 1994, DiGuglielmo told Shaner that it would be in his "best interest" to seek counseling through the company's employee assistance program. Shaner testified that "[f]or the most part" he had a negative attitude at this time, and he voluntarily agreed to attend counseling for assistance with his "work and health problems." The company permitted him to attend counseling sessions on its time and at its expense. According to Shaner, after he had attended several sessions, DiGuglielmo requested that he stop going to counseling, or at least that he stop going on company time. Shaner felt that this request was "inappropriate," inasmuch as DiGuglielmo had asked him to seek counseling in the first place. Shaner nevertheless continued to attend counseling during work hours because he felt that he was benefitting from it.

DiGuglielmo prepared a performance evaluation of Shaner for the period ending March 15, 1995.7 According to this evaluation, Shaner "has shown a very negative attitude through out the last year" and he "has not performed to the

level expected of a Sr. Program Analyst [and] his analytical
skills are suspect." Further, the evaluation stated that
Shaner "continues to point fingers at others and make
excuses when things go wrong" and "[w]hen he is given

_____

6. The thermostat in this room also affected the temperature in other
employees' nearby work areas, which somewhat limited Shaner's ability
to control the temperature.

7. In this evaluation, Shaner was graded "marginal" in the categories of
"assignments and results achieved" and "overall performance," and
"below expectations" in the category of "qualitative." "Below
expectations"

indicated that Shaner "frequently does not meet objectives."

5

assignments he complains about them and they drag out
longer than they should."

On April 19, 1995, Shaner again went on leave for
medical reasons and his condition has prevented him from
ever returning to work. Synthes notified Shaner by letter
dated October 5, 1995, that it was terminating his
employment effective October 19, 1995, "in accordance with
our company policy of terminating employment after six
months of medical leave of absence." The letter advised
Shaner that he could "reapply" for employment should his
condition improve. Shaner has been totally and
permanently disabled since he left Synthes in April 1995.

On April 17, 1996, Shaner filed a second EEOC charge
alleging discrimination on the basis of disability and
retaliation for the filing of his first EEOC charge. In this
second charge, Shaner alleged that he was "harassed" in
several respects. He complained about the heat being
turned up in the office, and he indicated that he had
"received a poor review" in April 1994. He stated that
"[a]round the end of 1994, I was told by Mike DiGuglielmo
that I had to go to counselling [sic] because I had a `bad
attitude.' " He claimed that he was "harassed to the point
that my disability was aggravated," which forced him to go
on disability and ultimately led to his termination.

Shaner filed this action in the district court on June 23,
1997. Count I of the complaint alleged disparate treatment
on account of disability in violation of the ADA, 42 U.S.C.
SS 12111-12117, "as evidenced by, inter alia, (a) [ ] sudden
change in [the company's] performance evaluations of
plaintiff, after being informed of plaintiff 's diagnosis of
Multiple Sclerosis . . . ; (b) refusing to allow[plaintiff] the

special training necessary to the successful completion of his work, while allowing it to other employees;[and] (c) engaging in harassment of plaintiff including the manipulation of the room temperature of his workplace with the knowledge that such behavior would cause plaintiff serious illness or total disability." Count II alleged retaliation in violation of the ADA, 42 U.S.C. S 12203, "as evidenced by, inter alia, (a) [ ] harassment of plaintiff, including turning up the heat in the office so as to cause exacerbation of plaintiff 's condition; (b) transferring

6

plaintiff to a converted closet when he complained about the manipulation of the heat; (c) making false accusations of poor performance by plaintiff; (d) requiring plaintiff to undertake counseling from a third party provider which was harassing and unnecessary; and (e) terminating plaintiff 's employment while he was out on that medical leave." Count III alleged intentional infliction of emotional distress. Following the company's motion for summary judgment, the district court dismissed all claims in an order dated December 11, 1998, and entered on December 14, 1998. Shaner filed a notice of appeal from the district court's order.

II. JURISDICTION and STANDARD OF REVIEW

The district court had subject matter jurisdiction over Shaner's ADA claims pursuant to 28 U.S.C. S 1331 and supplemental jurisdiction over his state law claim pursuant to 28 U.S.C. S 1367. We have jurisdiction pursuant to 28 U.S.C. S 1291. Our standard of review is plenary. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999). "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Jones v. School Dist. of Philadelphia, 198 F.3d 403, 409 (3d Cir. 1999). We must view the record in the light most favorable to Shaner and draw all reasonable inferences in his favor. Id.

III. DISCUSSION

A. ADA Claims

In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse

employment decision as a result of discrimination." Gaul v.
Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); see
also Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir.

1998) (en banc) (citing Gaul). To establish a prima facie
case of retaliation under the ADA, a plaintiff must show "(1)
protected employee activity; (2) adverse action by the
employer either after or contemporaneous with the
employee's protected activity; and (3) a causal connection
between the employee's protected activity and the
employer's adverse action." Krouse v. American Sterilizer
Co., 126 F.3d 494, 500 (3d Cir. 1997).

We have indicated that the burden-shifting framework of
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct.
1817 (1973), applies to ADA disparate treatment and
retaliation claims. See Walton v. Mental Health Ass'n of
Southeastern Pa., 168 F.3d 661, 667-68 (3d Cir. 1999);
Krouse, 126 F.3d at 500-01; Newman v. GHS Osteopathic,
Inc., 60 F.3d 153, 156-58 (3d Cir. 1995). We recently have
described the McDonnell Douglas framework as follows:

> Briefly summarized, the McDonnell Douglas analysis
> proceeds in three stages. First, the plaintiff must
> establish a prima facie case of discrimination. If the
> plaintiff succeeds in establishing a prima facie case,
> the burden shifts to the defendant `to articulate some
> legitimate, nondiscriminatory reason for the employee's
> rejection.' [McDonnell Douglas, 411 U.S. at 802, 93
> S.Ct. at 1824.] Finally, should the defendant carry this
> burden, the plaintiff then must have an opportunity to
> prove by a preponderance of the evidence that the
> legitimate reasons offered by the defendant were not its
> true reasons, but were a pretext for discrimination. See
> Texas Dep't of Community Affairs v. Burdine, 450 U.S.
> 248, 252-53, 101 S.Ct. 1089, 1093 (1981) (citations
> omitted). While the burden of production may shift,
> `[t]he ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated against
> the plaintiff remains at all times with the plaintiff.' Id.
> Our experience is that most cases turn on the third
> stage, i.e., can the plaintiff establish pretext.

Jones, 198 F.3d at 410.

We have stated as follows with regard to the application
of the third step of the McDonnell Douglas framework at the
summary judgment stage:

At this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race [or disability] discrimination. At trial, the plaintiff must convince the finder of fact`both that the reason was false, and that discrimination was the real reason.' St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993) (emphasis in original). The factfinder's rejection of the employer's proffered reason allows, but does not compel, judgment for the plaintiff. Sheridan [v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066-67 (3d Cir. 1996) (en banc)].

 On numerous occasions, we have explained the plaintiff 's burden at summary judgment on this aspect of the McDonnell Douglas tripartite framework. Specifically, in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), and later in Sheridan, we stated that a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing `to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.' Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1067.

Id. at 412-13.8 "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . . Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

_____

8. We recently have made clear that a plaintiff 's ultimate burden in a retaliation case is to convince the factfinder that retaliatory intent had a
"determinative effect" on the employer's decision. See Woodson v. Scott Paper Co., 109 F.3d 913, 931-35 (3d Cir. 1997); Krouse, 126 F.3d at 501 ("The plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.") (citing Woodson).

9

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-

discriminatory reasons." Fuentes v. Perskie , 32 F.3d 759, 765 (3d Cir. 1994) (citation and internal quotation marks omitted).

According to Shaner's complaint, the company's violation of the ADA was "evidenced by" several forms of improper conduct--the denial of training, the poor performance evaluations, the manipulation of office temperature, the relocation of his office, the request that he attend counseling, and the termination. It is unclear from the complaint whether Shaner is claiming that each of these forms of conduct constitute separate "adverse employment actions"--and thus constitute separate substantive ADA claims--or whether he is alleging some of them simply as proof of discriminatory or retaliatory intent. Synthes contends that the only substantive ADA claims properly preserved through a timely EEOC charge were the discriminatory denial of PC applications training (which Shaner raised in his first EEOC charge) and the retaliatory termination (which he raised in the second). According to Synthes, Shaner conceded in the district court that he was not pursuing any other allegations as substantive ADA claims. The district court assumed that Shaner primarily was challenging the denial of PC applications training and the termination, and treated the other alleged conduct as merely evidence of improper intent. Shaner's briefing on this appeal does not clarify the matter; his reply brief simply refers to all of the alleged improper conduct as "evidence" of discrimination or retaliation.

We will not determine which of Shaner's allegations were properly preserved through a timely EEOC charge, nor will we dwell on whether Shaner seeks to pursue each of his various allegations as separate substantive ADA claims. Rather, we conclude, considering all of Shaner's allegations, that there is not sufficient evidence to permit a reasonable factfinder to conclude that the company acted with discriminatory or retaliatory intent with respect to any of the challenged conduct. More specifically, with respect to the disparate treatment claim, we hold that Shaner has not

10

presented enough evidence to permit a factfinder either to disbelieve the company's articulated reasons, or to conclude that discrimination on account of disability was the real reason for any of the alleged improper actions. With respect to Shaner's retaliation claim, we hold that Shaner has not presented sufficient evidence to establish a causal connection between any of the alleged improper actions and the filing of his first EEOC charge. Moreover, even assuming a prima facie case of retaliation could be established, we conclude that Shaner has not presented

sufficient evidence to permit a factfinder either to disbelieve the company's reasons, or to conclude that retaliation was the real reason, for any of the alleged improper actions.

Like many (if not most) employment discrimination plaintiffs, Shaner has no direct evidence to indicate that anyone at Synthes exhibited hostility towards him based on his protected status (as a disabled person) or his protected activity (the filing of his first EEOC charge). The following exchanges from Shaner's deposition are illustrative:

Q. From the time you filed the [first EEOC] charge until you left Synthes, did anyone at Synthes, any manager at Synthes, including . . . Mike [DiGuglielmo] and Dick Jarvis, say anything to you about the charge you had filed with the EEOC in April of 1994?

A. I don't remember.

Q. Can you identify any conversation or any statement that you heard about that charge made by any of those people at this time?

A. No, I cannot.

Q. Did anyone report to you that any Synthes manager, including . . . Dick Jarvis or Mike, had made any statement regarding the EEOC charge that you had filed in April of 1994 from April 1st, 1994 until the time you left Synthes?

A. I can't remember.

. . . .

Q. [ ] Do you have any information that Synthes or any of its managers were retaliating against you

11

because you filed an EEOC charge in April of 1994 at any time that you were employed at Synthes?

A. Do I have any information? No.

. . . .

Q. Can you identify any fact or tell me about any information or any evidence you have which would indicate to you, in any way, that any manager of Synthes, at any time, retaliated against you because you filed an EEOC charge in April of 1994?

A. I don't remember any at this time.

. . . .

Q. Did you ever hear any comments made by any
Synthes manager, including . . . Dick Jarvis or Mike or
any other manager, that indicated that you were
discriminated against because of your disability or your
alleged disability?

A. No.

Q. Did anyone report to you any comments by any
member of Synthes management which indicated that
you were discriminated against because of your
disability or alleged disability?

A. I can't remember any, no.

App. at 78, 82.

Of course, direct evidence of intent is not required to
establish a discrimination claim. See Pivirotto v. Innovative
Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999). In the
absence of direct evidence, a plaintiff may rely on
circumstantial evidence to "demonstrate such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions" in the employer's proffered legitimate
reasons so as to permit a reasonable factfinder to infer that
the employer did not act for the proffered reasons. See
Fuentes, 32 F.3d at 764-65. Accordingly, we will examine in
detail the various instances of improper conduct Shaner
alleges to determine whether he possibly can show such
weaknesses or implausibilities. We conclude that he

12

cannot, and thus his ADA claims cannot survive a motion
for summary judgment.9

1. Denial of training

Shaner claims that, upon his commencing employment
with Synthes, the company promised him that he would
receive PC applications training. According to Shaner, he
was told that "every opportunity would be available" for
such training, and the company's "extensive PC network"
was one of the reasons he chose to accept a job at Synthes.
Shaner never received the PC applications training he
desired, despite his requests for it. He claims that other
similarly situated workers received this type of training,
including Vincent Jasinnas, who received training in July
1993 on Excel.

The company contends that PC applications and Excel were not necessary for Shaner to perform his job. Shaner's testimony fails to counter the company's contention, and indeed tends to support it. At his deposition, Shaner speculated that training in PC applications or Excel "possibly" might have been helpful to him--for example, if a user asked him a question related to PC applications -- but he gave no testimony indicating that training in these areas was germane to his regular job functions. Indeed, Shaner answered "No" when asked whether he needed Excel in order to do his job as of January 1994, when he and Jarvis exchanged emails regarding Excel training. Further, Shaner indicated during his deposition that he did not know whether Jasinnas, who received Excel training, actually was doing work involving the use of Excel. Perhaps most significantly, Shaner's testimony shows that the

_____

9. We have indicated that "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." See Woodson, 109 F.3d at 921 (citation omitted). Nevertheless, where, as here, a plaintiff alleges that discrimination or retaliation is evidenced by discrete categories of conduct, we believe that some examination of each category is necessary in order to assess the merits of the case. See id. We will examine each of the categories of improper conduct alleged by Shaner, keeping in mind our admonition that "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance." Id. (citation omitted).

13

denial of PC applications and Excel training began before November 1993, when he first advised the company of his MS. Accordingly, we can see no basis for a reasonable jury to conclude that Shaner was denied PC applications or Excel training on account of his disability.10

Further, there is no evidence of a discriminatory denial of training on the J.D. Edwards system. Shaner's testimony indicates that he received a week-long training seminar on J.D. Edwards in April 1994, along with other Synthes programmers.11 In January 1995, Shaner was instructed to spend four to five hours per week with J.D. Edwards on his own in order to become comfortable with the system. Manuals for J.D. Edwards were available, which Shaner read and understood, and Shaner was advised that he should seek help from another employee who was proficient with the system. Shaner tried to comply with the company's instruction, but he found the system difficult to learn, although he was a computer professional. Shaner never

_____

10. According to Shaner's brief, "the record revealed that all the programmers except Shaner had received PC Applications training, causing even the other programmers to wonder why plaintiff was being excluded." We do not see any support in the record for this contention. Shaner's brief cites only to the testimony of a Synthes employee, Crystal Dean. However, Dean was referring not to PC Applications training but to another form of training--on a system called J.D. Edwards--when she testified that Shaner was denied training that others had received. ("[Shaner] was the last of the programmers who had not received training for J.D. Edwards.") (emphasis added). Yet, Shaner conceded at his deposition that he received a week of J.D. Edwards training along with other programmers, and Dean testified that she was unaware that Shaner had received this training. Indeed, Dean conceded that she had no personal knowledge as to the J.D. Edwards training received by any of the programmers, including Shaner, and she indicated that her knowledge regarding denials of training was based almost entirely on what Shaner had told her. Accordingly, Dean's testimony does not provide a basis for inferring discriminatory intent in relation to the denial of PC applications training, or any other form of training.

11. Shaner also contends that he wrongfully was excluded from meetings of the "SIBIS" team, which was involved in programming the J.D. Edwards system. Yet, Shaner testified that his exclusion from the SIBIS team began when Jarvis joined the company, which was well before Shaner disclosed his illness to the company in November 1993.

14

asked anyone for help, because he felt it would be "humiliating" to do so, and he never indicated to anyone that he could not or would not learn the system on his own. He admitted in his deposition that he simply failed to carry out his superiors' expectation that he familiarize himself with J.D. Edwards. As with PC applications training, we see no grounds for a reasonable jury to conclude that the company acted with discriminatory intent with respect to its decision not to provide Shaner with additional formal training on J.D. Edwards.12

2. Performance evaluations

Shaner's allegation that there was a "sudden change" in his performance evaluations after he informed the company that he suffered from MS is not supported, and indeed is contradicted, by the record evidence. Shaner's May 1993 performance evaluation--which Shaner himself viewed to be highly critical--was given several months before he informed Synthes about his disease and nearly a year before he filed his first EEOC charge. According to Shaner's testimony, he suspected at the time that the motive behind the criticisms in the 1993 evaluation was Jarvis's desire to force out programmers who pre-dated Jarvis's arrival at

Synthes. While this motive may not have been benevolent, it could not have been based on Shaner's disability, which had not yet been made known to the company. According to Shaner's testimony, his next evaluation, in April 1994-- which he received prior to the filing of his first EEOC charge, was a "carbon copy" of the 1993 evaluation. A subsequent evaluation in March 1995, like the two prior ones, indicated that Shaner was not performing to the level expected of a senior analyst. In short, the record shows that Shaner's performance evaluations contained similar

_____

12. Our conclusions regarding PC applications training and J.D. Edwards training are further bolstered by Shaner's testimony that the company in fact provided him with various training during the course of his employment, including the week-long seminar on J.D. Edwards. Further, the company paid for Shaner to attend periodic seminars with an organization called the "Delaware Valley Computer Users Group." The fact that Shaner received some training from the company severely undermines his claim that the company deprived him of other forms of training on account of his disability.

15

criticisms both before and after he made the company aware that he suffered from MS and before and after he filed his first EEOC charge.13

Under these circumstances, there is simply no evidence that any of these evaluations was causally linked to the filing of Shaner's first EEOC charge or that any of them was motivated by discriminatory or retaliatory intent. We have indicated that temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is "unusually suggestive of retaliatory motive." See Krouse, 126 F.3d at 503 (internal quotation marks omitted); Woodson, 109 F.3d at 920. Yet the timing of the performance evaluations in this case is anything but suggestive, inasmuch as Shaner received the 1993 and 1994 evaluations prior to the filing of his first EEOC charge, and the 1995 evaluation was prepared nearly a year after the filing of the charge.

Moreover, although "mere passage of time is not legally conclusive proof against retaliation," we have indicated that the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period. See Krouse, 126 F.3d at 503-04 ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiff 's charge and

the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law."); Woodson, 109 F.3d at 920-21. The record does not support a finding that there was an intervening retaliatory animus so as to establish a causal connection between the filing of Shaner's first charge and the 1995 evaluation, particularly in view of the circumstance that the three evaluations were consistent.

We also make the following observation with respect to performance evaluations. While it is possible that a

_____

13. Indeed, prior to November 15, 1993, Shaner complained to his MS support group that he had received an unfairly critical performance review from his employer.

16

manager might make a poor evaluation to retaliate against an employee for making an EEOC charge, still it is important that an employer not be dissuaded from making what he believes is an appropriate evaluation by a reason of a fear that the evaluated employee will charge that the evaluation was retaliatory. In this regard, we are well aware that some employees do not recognize their deficiencies and thus erroneously may attribute negative evaluations to an employer's prejudice. Accordingly, in a case like this in which the circumstances simply cannot support an inference that the evaluations were related to the EEOC charges, a court should not hesitate to say so.

3. Office temperature

According to Shaner's testimony, prior to the relocation of his office, he frequently saw employees, including Jarvis, adjusting the thermostat in the area of the building where Shaner and others worked. He admitted during his deposition that he had no evidence that any of these people were changing the thermostat in order to harm him. Indeed, he responded "I would think so" when asked whether these people were adjusting the thermostat simply because they were uncomfortable with the office temperature, and he indicated that he "disagreed" with others regarding the appropriate temperature.14 Most significantly, Shaner testified that the thermostat frequently was adjusted too high for his liking prior to November 1993,

_____

14. Shaner's testimony in this regard is corroborated by testimony from other Synthes employees. Denise Arms-Sadowski testified that she had a low tolerance for cold temperatures and often asked Jarvis to raise the heat. She also testified that there were other employees who complained

about the office being too cold. According to George Felix, "Bob [Shaner] would go to the thermostat and turn the heat down. There were employees that complained that it was then too cold in the office and they would turn the heat back up." Indeed, at oral argument before us, Shaner's counsel stated that "it is clear from the evidence on the record that they were raising the heat to over 75 degrees for the comfort level of

other employees." Oral Argument Tr. at 7 (emphasis added). Of course, we do not suggest that this case turns on an inquiry as to how far an employer must go to make a reasonable accommodation under the ADA to a disabled person at the expense of other employees. See Kralik v. Durbin, 130 F.3d 76, 80-84 (3d Cir. 1997).

17

when he first informed the company that he suffered from MS. Thus, with respect to the period prior to the relocation of Shaner's office, we see no basis for a finding that anyone adjusted the temperature with discriminatory or retaliatory intent, and no evidence of a causal link between Shaner's problems with office temperature and the filing of his first EEOC charge.15

According to Shaner, after his office was relocated, there were four or five instances when an unknown individual or individuals turned the heat all the way up while he was at lunch. These isolated incidents do not in themselves rise to the level of adverse action upon which to base a claim for disparate treatment or retaliation. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998) ("[M]inor or trivial actions that merely make an employee `unhappy' are not sufficient to qualify as retaliation under the ADA . . . ."). Even if a factfinder could infer that these incidents were motivated by hostility toward Shaner's disability, we do not believe, in light of all the evidence, that these incidents provide a basis for a rational finding that any of the company's other actions were motivated by discriminatory or retaliatory intent.16

_____

15. We do not see how an intent to discriminate or retaliate can be inferred from the fact that Shaner was required to work under the same temperature conditions as other employees.

16. Shaner's claim that the company acted with retaliatory intent in relocating his office is entirely without merit. The company was responding to Shaner's own complaints about office temperature, and Shaner conceded at his deposition that the company"attempted to accommodate me" by moving him to a room with its own temperature control. Indeed, according to Shaner's testimony, he and DiGuglielmo agreed prior to the move that it would be better for him to work in an area where he could control the temperature. Further, Shaner's

allegation that the conference room to which he was moved was a "converted closet" is completely at odds with his own deposition testimony. Although the conference room was once used for storage, it also had been an office for two consultants, and it contained windows looking out onto a hallway. We simply see no basis for a finding that the office relocation was causally linked to the filing of the EEOC charge or that the relocation was made with retaliatory intent.

We also see no evidence of retaliatory intent with respect to DiGuglielmo's request that Shaner attend counseling. Shaner voluntarily

## 4. Termination

Shaner does not challenge the company's general policy requiring termination of employees who are on medical leave for six months. Nor does he dispute that he was permanently and totally disabled when he went on leave in April 1995 and that he has been unable to work since. Shaner's argument is that the company intentionally or recklessly caused an exacerbation of his MS through its discriminatory and retaliatory treatment--including the manipulation of the office temperature--so as to compel him to take a leave of absence, thereby allowing the company to apply its termination policy as a pretext for retaliation.17 To support this argument, Shaner cites his own hearsay testimony that another employee told him that the company began removing and rearranging things in Shaner's office a day or two after Shaner went on leave in April 1995. Shaner contends that the company did not know at that time how long he was going to be absent.

We have no trouble concluding that a reasonable factfinder cannot accept Shaner's theory that the company intentionally or recklessly caused his MS to worsen. Contrary to the inference which Shaner seeks to raise, the

_____

attended the counseling because he felt that it would be beneficial to him. As with the relocation of Shaner's office, the evidence shows only that the company was making efforts to help Shaner, rather than to discriminate or retaliate against him. The very purpose of the ADA would be undermined if, in the context presented here, we were to view the company's attempts to aid or accommodate Shaner as evidence of retaliatory treatment.

17. Shaner's brief argues as follows:

    Focusing entirely on Synthes's `non-discriminatory reason' for firing
        Robert Shaner (Synthes's alleged policy of firing any employee out
        on medical leave for more than six months), the court below

accepted Synthes's statements that they always adhered to the six month policy, disallowing that Shaner need not have offered evidence challenging the existence of such a policy, since he was charging that Synthes had caused his disability so that it could apply the policy to him. The punctilious procedural perfection of Synthes's use of that policy is irrelevant.

Appellant's Br. at 37–38.

evidence shows that the company made substantial efforts to accommodate him. When Shaner returned from hisfirst leave of absence in 1994, the company lightened his month–end work load and allowed him to attend water therapy sessions during work hours. In November 1994, the company moved him to an office with its own thermostat so that he could control the temperature in his work space. The company also permitted him to leave work early when he was ill and allowed him to attend counseling sessions during work hours. Considering all the evidence, there is no basis for a factfinder to conclude that the six–month policy was applied as a pretext for retaliation.

Further, the evidence does not establish a causal link between the termination and the filing of Shaner'sfirst EEOC charge. The termination took place approximately a year and a half after the filing of the charge, and the evidence does not support a finding that there was such intervening discrimination or retaliatory harassment as to permit an inference that the termination was linked to the filing of the charge. See Krouse, 126 F.3d at 503–04 (affirming summary judgment for employer on retaliation claim where there was no evidence of antagonism or retaliatory animus during nineteen–month period between the filing of the plaintiff 's charge and the alleged retaliatory action). Although Shaner contends that the company planned on firing him as soon as he began his leave in April 1995, the fact remains that he was not fired until six months later, pursuant to a neutral policy. There is no basis for a finding of retaliation here. In sum, the district court properly granted summary judgment with respect to Shaner's ADA claims.

B. Emotional Distress

We further conclude that there is not sufficient evidence to establish a claim for intentional infliction of emotional distress under Pennsylvania law. That tort is defined as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional

distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

20

Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (quoting Restatement (Second) of Torts S 46).18 "[C]ourts have been chary to allow recovery for a claim of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven." Id. at 753-54. The Hoy court rejected an emotional distress claim arising from workplace sexual harassment involving sexual propositions, physical contact with the plaintiff 's knee, off-color jokes, regular use of profanity, and the posting of a sexually suggestive picture. See id. at 754-55. In so ruling, the court stated that "the conduct exhibited . . ., while unacceptable, was not so extremely outrageous . . . that would allow for recovery under this most limited of torts." Id. at 755.

We will assume that conduct which is intended to cause a worsening of a disabled person's physical symptoms may qualify as "extreme or clearly outrageous." Nevertheless, viewing the record in the light most favorable to Shaner, we do not find sufficient evidence to establish such a claim here. Shaner's most serious allegation--manipulation of the office temperature with intent to cause him harm or reckless disregard for his health--is simply not supported by the record, which indicates that others adjusted the temperature simply for their own comfort.19 Accordingly, Shaner's emotional distress claim cannot survive summary judgment.20

_____

18. The Pennsylvania Supreme Court has not expressly adopted section 46 of the Restatement. See Hoy, 720 A.2d at 753 n.10. In Hoy, the court assumed the existence of the tort under Pennsylvania law and concluded that the plaintiff had failed to establish a right of recovery. See id.

19. Although Shaner testified as to four orfive occasions when someone turned the heat all the way up in the conference room while he was at lunch, we do not believe that these isolated incidents rise to the level of

outrageous conduct, even assuming that the perpetrator was aware of the effect of heat on Shaner's MS. Such isolated office pranks do not meet the threshold of this "most limited of torts." See Hoy, 720 A.2d at 755.

20. The district court held that Shaner's emotional distress claim was barred by the Pennsylvania Workers' Compensation Act, and further indicated that any heat-related aggravation of Shaner's MS would be a

work-related injury compensable only through workers' compensation. In light of our disposition, we need not address these issues.

21

IV. CONCLUSION

For the reasons set forth above, the district court's order entered December 14, 1998, granting summary judgment in favor of Synthes will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

22