James E. HALL, Plaintiff,

v.

**BELL ATLANTIC CORPORATION and Bell Atlantic–Delaware, Inc., Defendants.**

**No.  Civ.A. 99–394–SLR.**

United States District Court, D. Delaware.

March 23, 2001.

Thomas S. Neuberger, of Thomas S. Neuberger, P.A., Wilmington, Delaware, John W. Hermina, of Hermina Law Group, Laurel, Maryland, for Plaintiff.

Richard S. Cobb, of Klett Rooney Lieber & Schorling, Wilmington, Delaware, Harry T. Jones, and Lily M. Garcia, of Hogan & Hartson, L.P., Washington, D.C., for Defendants.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

Plaintiff James E. Hall filed this action on June 21, 1999 against defendants Bell Atlantic Corporation ("BAC") and Bell Atlantic–Delaware, Inc. ("BA–DE") alleging discrimination based on his race, color and disability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, ("Title VII"), 42 U.S.C. § 1981, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, (the "ADA").[1] Plaintiff claims that defendants failed to accommodate his disability, retaliated against him for his protected activities, denied him training, subjected him to a hostile work environment and denied him promotions. The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Currently before the court is defendants' motion for summary judgment on all counts of the complaint. (D.I.24) For the reasons that follow, the court will grant defendants' motion for summary judgment.

### II. BACKGROUND

Plaintiff, an African–American, was hired by BA–DE on May 12, 1986, and was promoted to Services Technician in 1987 and then to Systems Technician on March 17, 1996. (D.I.26, Ex. 2) As of May 2000, plaintiff continued to be employed by BA–DE. The duties of Systems Technician include, *inter alia*, the installation and repair of telecommunications systems; the installation and maintenance of access lines for radio, video, microwave, analog, digital and hi-capacity equipment; and the installation, repair, and maintenance of inside cables, wires, and plug-in equipment to con-

1. Hall's co-plaintiff, Kenneth A. Miller, was dismissed from this action with prejudice by stipulation of the parties. (D.I.23)

nect telecommunication systems and equipment. (D.I. 26 at A30) To accomplish these tasks, Systems Technicians must climb poles and ladders, work aloft, move and lift up to 100 pounds, and drive a company vehicle. (*Id.*)

### A. The September 4, 1996 Vehicle Accident

On September 4, 1996, plaintiff was involved in an accident with his company vehicle.[2] (D.I. 26 at A34–A36) After the accident, plaintiff complained of soreness in his back and neck and was absent from work until January 28, 1997. (D.I. 26 at A37) When plaintiff returned to work, his medical restrictions called for sedentary duty and prohibited lifting, bending, or reaching.[3] (D.I. 26 at A40) Plaintiff was also required to leave three hours early, three days per week, to attend physical therapy. (D.I. 26 at A66) Because of his medical restrictions, plaintiff's supervisor, Bernard Walker ("Walker"), assigned him to light duty performing miscellaneous clerical work. (D.I. 26 at A66) Plaintiff continued to be paid as a Systems Technician while performing these clerical tasks. (D.I. 26 at A67)

After the accident, plaintiff was periodically examined by a physician to determine the extent of his disability. Until March 16, 1999, plaintiff was on light duty with medical restrictions that permitted him to lift no more than 20 and sometimes as little as 5 pounds. (D.I.26, Exs.7, 9) For about one year during this time, plaintiff was also medically restricted from climbing and from driving and sitting for more than 45 minutes. (*Id.*) During this light duty period, plaintiff completed at least 20 hours of training. (D.I. 26 at A86)

For the period from March 16, 1999 until May 28, 1999, plaintiff's medical restrictions were amended to permit him to lift, push or pull up to 40 pounds. (D.I.26, Ex. 7) From 1999 to mid–2000, plaintiff completed at least 32 more hours of training. (D.I. 26 at A86) As of May 2000, plaintiff was medically restricted from climbing and lifting over 40 pounds. (D.I.26, Exs.7, 11)

### B. The Medically Restricted Employees Plan

Effective May 12, 1997, BA–DE initiated a new policy for the placement of medically restricted employees called the Medically Restricted Employees Plan (the "Plan"). (D.I.26, Ex. 12) The Plan sets forth the procedures for employees who are able to work but, due to medical restrictions, cannot perform the essential functions of their jobs with or without reasonable accommodation. Before placing an employee on the Plan, BA–DE determines, in consultation with the employee, whether the job can be modified to permit the employee to perform the essential functions. If a job cannot be modified, and if the employee's restriction will last more than 30 days, the employee can be placed in the indefinite reassignment process. Such employees are given "priority placement" status for lateral or downgrade job openings that become available. (*Id.*)

If no suitable work is found for employees in the indefinite reassignment process, BA–DE convenes a Reasonable Accommodations Committee ("RAC") to review the

---

**2.** The parties dispute who was at fault in the accident.

**3.** CORE, Inc. ("CORE") is the administrator of defendants' disability benefits plan. Based on medical information provided by an em-

ployee's health care providers, CORE determines an employee's medical restrictions and whether they qualify for benefits under the Bell Atlantic Sickness and Accident Disability Benefits Plan. (D.I. 25 at 5)

case. The RAC reviews possible accommodations in the employee's current job, openings that may become available, a possible change in the employee's medical condition so that he could perform the essential functions of his job, and any other relevant factors. Under the original Plan effective May 12, 1997, the RAC could dismiss a medically restricted employee for whom no suitable work was available. (D.I.26, Ex. 13) As of August 9, 1998, however, the RAC no longer has this authority. (D.I.26, Ex. 12) Walker claims that he reviewed the Plan with plaintiff on June 13, 1997. Walker did not place him in the indefinite reassignment process of the Plan at that time. (D.I. 26 at A67) Plaintiff claims that he was placed on the Plan on or around February 24, 1999.[4] (D.I. 29 at B50)

### C. Worker's Compensation Benefits

Following plaintiff's 1996 accident, BA–DE entered an Agreement to Compensation authorizing the payment of worker's compensation benefits to plaintiff. (D.I. 26 at A106) Pursuant to a July 16, 1999 decision of the Industrial Accident Board ("IAB") in *James Hall v. Bell Atlantic–Delaware, Inc.*, Hearing No. 1089683, plaintiff is currently receiving partial disability benefits due to his diminished earn-

ing capacity. (D.I.26, Ex. 15) Plaintiff has been paid a lump sum of $42,680.58, and will receive a weekly payment of $372.23 for the balance of the 300–week partial disability period that began on February 12, 1997 and will conclude in the fall of 2002.[5] (D.I. 26 at A121–A122)

On November 4, 1999, plaintiff filed a Petition to Determine Additional Compensation with the IAB, demanding that BA–DE pay medical expenses for certain shoulder injuries.[6] (D.I. 26 at A123) The IAB held a hearing on these issues on April 18, 2000 and as of May 2000, had not yet issued a determination.

Plaintiff also filed an action against defendants in Delaware Superior Court which consolidated two personal injury claims, an underinsured motorist coverage case, and a case in which plaintiff alleged that CORE did not pay him benefits to which he was entitled. This action was settled out of court. (D.I. 25 at 9)

### D. The Federal Class Action Lawsuit

In *Richard v. Bell Atlantic Corp.*, filed in the U.S. District Court for the District of Columbia on September 23, 1996, 127 plaintiffs sought to represent a class of past and present African–American employees who had been employed between

---

4. Plaintiff has since grieved his placement on the Plan because his Union does not recognize the Plan and because it allegedly allows the company to treat plaintiff less favorably than similarly situated white employees with a disability. (D.I. 29 at B50) Plaintiff has failed to demonstrate the merits of this allegation.

5. Defendants note that plaintiff's weekly payment was initially miscalculated as $289.50, and that plaintiff was reimbursed for the difference. (D.I. 25 at 9) Plaintiff still pursued the issue because he claims that he should have received interest on the underpaid amount even though defendants contend that his collective bargaining agreement does not

provide for any such interest to be paid. (D.I. 31 at 3)

6. Plaintiff claims to have required surgery in both of his shoulders because of his September 4, 1996 accident. In particular, plaintiff claims that his left shoulder was injured due to overuse after the accident. BA–DE contends that plaintiff only sprained his right shoulder and that it did not require surgery. BA–DE further contends that the claimed left shoulder injury is unrelated to the September 4, 1996 accident, but instead is a function of an intervening accident on April 25, 1998 involving Hall's personal vehicle about which he never informed BA–DE. (D.I. 26 at A125)

March 20, 1993 and the date of trial and who had been subjected to (1) alleged discriminatory practices in the areas of promotions, terminations, job assignments, evaluations, discipline, training, and constructive discharge; (2) retaliation; and (3) a racially hostile work environment. The Amended Complaint filed on January 27, 1997 added BA–DE as a defendant. Defendants moved to dismiss BA–DE as a party due to the absence of any named plaintiff employed by BA–DE. Plaintiffs filed an Opposition to Defendants' Motion to Dismiss the Delaware Operating Company on February 24, 1997 to which was appended, among other exhibits, an affidavit from plaintiff. BA–DE was later dismissed from the action on September 10, 1997 because there were no BA–DE employees among the 127 named plaintiffs.

7. Stanley Farenski is a Services Technician who, after back surgery, was medically restricted from lifting over 20 pounds. He was assigned to light duty, and after two months on the Plan his restrictions were removed and he returned to his position. (D.I.26, Ex. 27) In his affidavit, Farenski stated that while on light duty, he was allowed to go out on the street in the work truck and do "walkups." (D.I. 29 at B39)

8. John Whitfield was placed on sedentary duty after ankle surgery. After five months on the Plan, his restrictions were lifted and he returned to his position as Systems Technician. (D.I.26, Ex. 27) Plaintiff alleges that Whitfield was permitted to work in the field on orders that do not require ladder climbing. (D.I. 29 at B46) Defendants argue that plaintiff was also afforded the option to perform work in the field that is within his medical restrictions. (D.I. 31 at 8)

9. Leonard Dorbich returned to work following knee surgery with the restrictions that he cannot lift over 20 pounds and cannot stand for more than two hours. He was assigned to perform light duty clerical work and was not placed on the Plan because he expected his restrictions to be lifted soon. After two months, Dorbich returned to his regular Systems Technician duties. (D.I. 26 at A67–A68)

See *Richard v. Bell Atlantic Corp.*, 976 F.Supp. 40, 51 (D.D.C.1997).

### E. Plaintiff's Allegations

Plaintiff claims that he repeatedly requested, and was denied, accommodation to continue working in the field rather than at a desk in the company's garage. Moreover, Walker allegedly refused to permit him to perform work that would enable him to earn overtime pay, and plaintiff purportedly received payroll checks that did not account for his hours worked. (D.I. 26 at A69) Plaintiff also alleges that other similarly situated disabled employees such as Stanley Farenski,[7] John Whitfield,[8] Leonard Dorbich,[9] and Kenneth Bryson[10] were permitted to do light duty work in the field.[11]

10. Kenneth Bryson had foot surgery and was medically restricted to wearing sneakers instead of the required steel-toed shoes. BA–DE allowed Bryson to continue his position as a walking technician because he worked primarily in office environments. Bryson was not placed on the Plan because he was able to perform essential functions of his position at all times. (D.I.26, Ex. 27)

11. Plaintiff submitted an affidavit from a coworker, Roe Williams, in which Williams states:

> I am aware that Bell Atlantic Delaware, Inc. allows Caucasian individuals who are on light duty to do walk-ups and to continue work in the field, while [plaintiff] was relegated to doing desk work for months. I am also aware that by preventing [plaintiff] from doing walk-ups and other light duty work, Bell Atlantic was able to prevent [plaintiff from] earning any overtime compensation.

(D.I. 29 at B42) Of the four cited employees, only Leonard Dorbich reported to Walker, plaintiff's supervisor, during his period of disability. The others were supervised by Robert Gatch. (D.I. 25 at 24)

Plaintiff states that to receive training after the accident, he had to file "grievance after grievance" and that the training was routinely given to less senior white employees who were not disabled. (D.I.29, Ex. 2) Plaintiff also argues that he was denied 911 training on account of his disability, although defendants contend that plaintiff's supervisor promised it to him by the end of 2000.[12] (D.I. 29 at B44–B45) Furthermore, although plaintiff passed the Electronic Systems Minicourse Test for promotion to Systems Technician on April 13, 1995, he was not promoted to that position until March 1996. (D.I. 29 at B44)

Plaintiff makes general allegations that "numerous supervisors[13] threatened plaintiff that he would lose his job, denied him training and worker's compensation benefits, cancelled his health insurance, and placed false information in his personnel file."[14] (D.I. 26 at A142) Plaintiff claims that Walker refused to complete his career action plan and then gave him a form that did not reflect their discussions, and that Walker and Karen Cusack ("Cusack"),

BA–DE's human resources manager, refused to sign his Personal Employee Data Form.[15] (D.I.26, Ex. 1) Plaintiff also claims that William McDevitt, his supervisor from 1996 to 1997, left a message for his whole crew indicating that "anybody with bee stings, dog bites, or back injury better watch out," when only African–Americans in the crew had these particular injuries. (D.I.1)

Plaintiff contends that he suffered many adverse employment actions since he filed the *Richard* affidavit, although according to Walker, the only disciplinary action plaintiff has received since February 24, 1997 is a one-day suspension on July 14, 1999 for taking an unauthorized vacation day.[16] (D.I. 26 at A70) Defendants further claim that plaintiff was never threatened with job loss, although in a August 20, 1998 letter, manager Barry Davis informed plaintiff that unless he provided proper medical documentation to reinstate his disability benefits, he would be terminated from BA–DE.[17] (D.I. 29 at B43)

---

**12.** Plaintiff claims that BA–DE manager Joe Williams told him that he would not receive 911 training because of his "light duty status," and that other not disabled, less senior employees were receiving the training. (D.I.29, Ex. 10)

**13.** In his EEOC Charge of Discrimination, plaintiff alleged discrimination by five white supervisors and one African–American supervisor, Bernard Walker, plaintiff's immediate supervisor from February 1997 until June 1999. (D.I. 26 at A–142)

**14.** According to defendants' Senior Specialist of Labor Relations, plaintiff had never been without health insurance since April 26, 1997. (D.I. 26 at A144)

**15.** Plaintiff allegedly requested a transfer but Cusack told him it would be futile due to his medical restrictions. (D.I. 29 at B45)

**16.** Plaintiff claims that he left a note informing Cusack that he had a physician's appointment and would miss work. Defendants did

not remove the suspension from his personnel file, which plaintiff alleges is "false information." (D.I. 29 at B46)

**17.** Although plaintiff only cites the latter portion of this letter; the entire body of the letter states:

On May 29, 1998 you informed Karen Cusack, Kirkwood Highway Resource Supervisor, that you were scheduled for surgery on June 1, 1998. On June 8, 1998, you were denied benefits by CORE, Bell Atlantic's health services provider, due to the lack of documentation received from both you and your physicians concerning the surgical procedure and due to your failure to initiate a sickness and accident claim. CORE has attempted numerous times to obtain this information from you and your physicians with no success. As a result, your employment at Bell Atlantic will be terminated as of August 31, 1998 unless you either report to work ... or provide CORE with the appropriate documentation for

On January 5, 1998, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 26 at A142) Plaintiff alleged discrimination on the basis of race and disability, specifically, harassment, denial of a reasonable accommodation, threats of job loss, denial of training, denial of workers' compensation benefits, cancellation of his health insurance, and the placement of false information in his personnel file. (*Id.*) Plaintiff also alleged retaliation for his participation as a class member in the *Richard* lawsuit. On March 30, 1999, the EEOC issued a Dismissal and Notice of Rights on plaintiff's charge with a determination that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (D.I. 26 at A143)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an

absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to summary judgment is discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Indus.*, 814 F.Supp. 1209, 1215 (D.Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

### A. Plaintiff's Title VII Claims

Plaintiff alleges that defendants discriminated and retaliated against him in viola-

consideration of reinstatement of benefits on or before August 31, 1998.

(D.I. 29 at B43)

**550**

tion of Title VII of the Civil Rights Act of 1964.[18] Claims brought pursuant to Title VII are analyzed under a burden-shifting framework; if plaintiff makes a prima facie showing of discrimination or retaliation, the burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their actions. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If defendants carry this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). In the case at bar, the court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case on any of his Title VII claims.

**1. Plaintiff Fails to State a Hostile Work Environment Claim**

To state a Title VII claim premised on a hostile work environment, plaintiff must show: (1) that he suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996).

It is important to note at the outset of this analysis that plaintiff is not disputing the characterization of his medical condition; i.e., he does not dispute that he has been correctly assigned to light duty.[19] Plaintiff does claim that he has been detrimentally affected by a hostile work environment, one in which white employees assigned to light duty are given the opportunity to work in the field and earn overtime and are given more training. Plaintiff also claims in this regard that he has been the subject of threatened job loss, cancelled health insurance, false personnel information, and an unwarranted disciplinary action.

At the close of discovery, plaintiff has failed to identify any white employees who are similarly situated;[20] therefore, he has

**18.** The anti-discrimination provision of Title VII provides:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).
The anti-retaliation section of Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e–3(a).

**19.** Indeed, in November 1999, plaintiff demanded that defendants pay him more worker's compensation benefits due to further injury to his left shoulder from "overuse."

**20.** The only white employees specifically identified by plaintiff had short term medical problems which warranted different treatment from that afforded to plaintiff, who has claimed medical disability since 1996.

failed to demonstrate that defendants' conduct toward him is racially motivated. Moreover, his complaints are either unsupported by the record (plaintiff has not been without health insurance within the statutory period), are isolated events (the "false" personnel form and one-day suspension), or are too conclusory in nature to constitute even prima facie evidence of "pervasive and regular" discriminatory conduct. Neither is there sufficient evidence to demonstrate that defendants' conduct has had or could be deemed by a reasonable person to have a detrimental effect on plaintiff, given than plaintiff is still employed at a salary level not reflective of his work (i.e., higher than his present work would normally demand), and given that plaintiff has had continuous training and benefits. Based on the record presented, the court concludes that plaintiff has failed to carry his burden of proving a prima facie case on his hostile work environment claim.

### 2. Plaintiff Fails to State a Denial of Training Claim

Plaintiff has failed to establish that he was denied training on account of either his race or his disability. Plaintiff received at least 52 hours of training during the time he was under medical restrictions. Plaintiff argues that he was impermissibly denied 911 training, but he has presented no persuasive evidence that this training was denied him because of his race or disability. Moreover, defendants had allegedly promised him 911 training by the end of 2000. The court finds no basis for a reasonable jury to conclude that defendants acted with discriminatory intent in denying training to plaintiff. *See, e.g.,*

*Shaner v. Synthes,* 204 F.3d 494, 503–504 (3d Cir.2000).

### 3. Plaintiff Fails to State a Retaliation Claim

To establish a prima facie case of retaliation under Title VII, plaintiff must show: (1) that he engaged in protected activity;[21] (2) that defendants took adverse employment action against him; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997). "The timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997). *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) (holding that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of "adverse employment action").

Plaintiff's suspension occurred over two years after he filed the affidavit in the *Richard* case. Plaintiff has not alleged any other adverse employment action after February 1997. Plaintiff has failed to demonstrate a causal link between filing the affidavit and any adverse employment action taken against him. Therefore, defendants are entitled to summary judgment on the retaliation claim.

### B. Plaintiff's Failure to Promote Claim Under 42 U.S.C. § 1981 Is Barred By the Statute of Limitations

Pursuant to the Supreme Court's decision in *Wilson v. Garcia,* 471 U.S. 261,

---

**21.** Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

278, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), a Section 1981 claim is subject to the limitations period for personal injury actions of the state where the claim was brought.[22] Therefore, defendants contend that plaintiff's Section 1981 claim is subject to the two-year statute of limitations of 10 Del. C. § 8119. Plaintiff argues that 28 U.S.C. § 1658, passed by Congress in 1990, changes the relevant statute of limitations to four years.[23] However, the Third Circuit's recent decision in *Zubi v. AT & T Corp.*, 219 F.3d 220, 226 (3d Cir.2000), confirmed that Section 1981 claims are subject to the relevant state limitations period for personal injury actions. Since plaintiff was promoted to Systems Technician on March 17, 1996 and the complaint was filed on June 18, 1999, plaintiff's failure to promote claim under Section 1981 is time barred under 10 Del. C. § 8119.[24]

### C. Plaintiff Fails to State a Denial of Reasonable Accommodation Claim Under the ADA

■ The ADA prohibits an employer from discriminating against a "qualified individual" with a disability.[25] *See* 42 U.S.C. § 12112(a). In order to state a prima facie case under the ADA, plaintiff must establish that he (1) has a disability; (2) is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer, and (3) has suffered an adverse employment action because of the disability. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998).

Plaintiff alleges that during the time that he was on light duty performing miscellaneous clerical work, defendants violated the ADA by discriminatorily denying him a reasonable accommodation that would have permitted him to perform his regular Systems Technician duties. However, the duties of a Systems Technician include climbing poles and ladders and lifting items weighing up to 100 pounds. It is undisputed that plaintiff could not perform such tasks because of his medical restrictions. Nevertheless, defendants accommodated plaintiff in a clerical position at his previous salary. Plaintiff has failed to demonstrate that other similarly situated

---

**22.** Section 1981, as amended by the Civil Rights Act of 1991 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

**23.** 28 U.S.C. § 1658 (1990) is entitled, "Time limitations on the commencement of civil actions arising under Acts of Congress" and provides:

Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action. *Id.*

Plaintiff argues that this provision applies to his Section 1981 claim because it stems from the Civil Rights Act of 1991, which amended the 1866 Act and was enacted after 28 U.S.C. § 1658.

**24.** Plaintiff's claim remains time-barred even assuming that the limitations period was tolled from the January 27, 1997 filing of the amended *Richard* complaint naming BA–DE as a defendant until BA–DE's September 10, 1997 dismissal from the action. *See Richard*, 976 F.Supp. 40 (D.D.C.1997).

**25.** Pursuant to Section 102 of the ADA, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions; and privileges of employment." 42 U.S.C. § 12112.

employees were treated differently. Therefore, the court shall grant summary judgment in favor of defendants on plaintiff's ADA claim.

## V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted. An appropriate order shall issue.